EMMPAK FOODS, INC. and National Union Fire
Insurance Company of Pittsburgh,
Plaintiffs-Appellants,

v.

LABOR AND INDUSTRY REVIEW COMMISSION and
Dennis Race, Defendants-Respondents.

Court of Appeals

No. 2006AP729. *Oral argument May 8, 2007.
—Decided June 6, 2007.*

2007 WI App 164

(Also reported in 737 N.W.2d 60.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Joseph Danas Jr.* and *Aaron R. Berndt* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee. There was oral argument by Joseph Danas, Jr.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Lowell E. Nass*, assistant attorney general. There was oral argument by *Lowell E. Nass*.

Before Snyder, P.J, Brown and Anderson, JJ.

¶ 1. BROWN, J. This is an appeal of a worker's compensation decision. Emmpak and its insurer challenge Dennis Race's receipt of temporary total disability (TTD) benefits after he was terminated for violating plant safety rules. Emmpak argues that it was Race's rule violation, and not his injury, that caused his wage loss and that he was therefore not eligible for TTD. We disagree and affirm. Race had a work-related injury that rendered him unable to use his left hand. At the time Race was fired, he was within his healing period and had not regained the use of the hand. He thus suffered a wage loss while his injury limited his ability

to work, meeting the statutory criteria for TTD. The Worker's Compensation Act contains no exception to liability for an injured employee who is subsequently terminated, even for good cause, and we refuse Emmpak's invitation to create one.

¶ 2.  The facts are not in dispute. Race worked for Emmpak Foods as an electrician. On June 10, 2002, he injured his left wrist on the job. The next day, he returned to work on "light duty" working with his right hand only. On July 21, Race was fired after he worked on a machine without first cutting off the power supply. It was his second violation of the same workplace safety rule and Emmpak's policy mandated termination for a second violation. The issue in this case is whether Race is entitled to disability benefits from the date of his termination until January 16, 2003, when his doctor determined that he had reached his healing plateau. The ALJ found that he was, the Labor and Industry Review Commission affirmed the ALJ, and the circuit court affirmed the Commission.

¶ 3.  We review the Commission's factual findings and legal conclusions, not those of the circuit court. *Epic Staff Mgmt., Inc. v. LIRC*, 2003 WI App 143, ¶ 13, 266 Wis. 2d 369, 667 N.W.2d 765. The parties raise no objections to the facts as found, and so this case presents only a question of law. While we generally review questions of law de novo, in appeals from agency decisions we frequently give deference to the agency's interpretation of a statute it is charged with applying. Our supreme court described the levels of deference in *Jicha v. DIHLR*, 169 Wis. 2d 284, 290–91, 485 N.W.2d 256 (1992):

> This court has generally applied three levels of deference to conclusions of law and statutory interpretation

in agency decisions. First, if the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, the agency determination is entitled to "great weight." The second level of review provides that if the agency decision is "very nearly" one of first impression it is entitled to "due weight" or "great bearing." The lowest level of review, the *de novo* standard, is applied where it is clear from the lack of agency precedent that the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented. (Citations omitted.)

¶ 4. While Emmpak concedes that the Commission has some experience in applying what it calls "the *Brakebush* doctrine," it nevertheless argues that we should review the agency's legal conclusions here de novo because the Commission's decision does not rest on statutory interpretation, but rather upon the supreme court's decision in *Brakebush Brothers, Inc. v. LIRC*, 210 Wis. 2d 623, 563 N.W.2d 512 (1997). Emmpak cites *Beecher v. LIRC*, 2004 WI 88, 273 Wis. 2d 136, 682 N.W.2d 29, in which our supreme court refused to give deference to the Commission's interpretation of prior case law. *Id.*, ¶ 26. The issue in *Beecher* was the odd-lot doctrine enunciated in an earlier supreme court case; the Commission had expanded on the doctrine by incorporating elements from a worker's compensation treatise. *Id.*, ¶ 24. The court pointed out that the purpose of agency deference is to avoid invading the prerogatives of the legislature, since the legislature has delegated the responsibility for administering certain statutes to the agency. *Id.* However, the odd-lot doctrine was a creation of the courts, not the legislature, and the supreme court held that "we need not defer to agency interpretations of our own decisions." *Id.*, ¶ 26.

¶ 5. While the *Beecher* majority did make the above-quoted broad statement, it is important to read that statement in context. The *Beecher* majority viewed the odd-lot doctrine (and particularly the procedural, evidentiary framework for its application) as a pure creation of the judiciary, rather than an interpretation of the worker's compensation statute. *Id.*, ¶ 26 n.7. The court noted that the agency decision "does not purport to interpret a statute or administrative rule." *Id.*, ¶ 26. It is thus clear that the *Beecher* court mandated de novo review only where an agency's legal conclusion is based on such a judicially-created doctrine, rather than on a judicial gloss of a statute or administrative rule.

¶ 6. This reading of *Beecher* is strengthened when one considers that the result of a broader reading would be the quick elimination of any deference to agency legal conclusions. The courts are regularly required to interpret agency-administered statutes; and the agencies are of course required to abide by the constructions that the courts approve. Thus, when a new case comes before an agency, it naturally and properly looks to the cases that have gone before and in its written decision cites to and analyzes them. But these cited cases, of course, contain interpretations of the very statutes that the agency is charged with applying. Often, these earlier cases will have deferred to and approved of the agency's interpretation of a particular statute—and it would be very strange if, simply by relying on our earlier approval of a statutory construction, the agency were actually to *lose* our deference. But that would be the result if *Beecher* is read as broadly as Emmpak would read it; each time we interpreted a worker's compensation provision, we would be cutting off any future deference to the agency on that provision.

¶ 7. For this reason, we decline Emmpak's invitation to review the Commission's decision de novo. As Emmpak's counsel conceded at oral argument, the *Brakebush* holding at issue here rests squarely on statutory construction. The court there looked at the Worker's Compensation Act, Wis. Stat. ch. 102 (1993–94), and found that it contained no exception to liability where an employee is terminated for cause during the healing period. *Brakebush*, 210 Wis. 2d at 635. This was the Commission's position in *Brakebush*, and it is the position that they here assert covers a different fact situation. The fact that the supreme court agreed with the Commission's statutory interpretation in *Brakebush* does not reduce the deference that we owe the Commission.

¶ 8. Emmpak nevertheless argues that the Commission's decision deserves only the middle level of deference, due weight, while the Commission argues that its experience is such that it is owed great deference. Under either standard, if we find no interpretation more reasonable than the one the Commission proffers, we must affirm the Commission. *See UFE Inc. v. LIRC*, 201 Wis. 2d 274, 286–87, 548 N.W.2d 57 (1996). Here, the Commission interprets the law to provide no exception to liability where an injured employee is terminated for cause, even when the employee has continued to work postinjury under restricted duty. Looking at the statutes and case law, we likewise can see no exception. Importantly, even Emmpak has not pointed us to any statutory language suggesting that such an exception exists. As such, we would affirm the Commission under either the great-weight or due-weight deference standard, and we need not choose between them. *See Wisconsin Ins. Sec. Fund v. LIRC*, 2005 WI App 242, ¶ 9 n.4, 288 Wis. 2d 206, 707 N.W.2d 293.

¶ 9. WISCONSIN STAT. § 102.03(1)(a)-(e) (1999–2000)[1] states that liability for worker's compensation exists where: (1) the employee sustains an injury; (2) at the time of the injury, both employee and employer are subject to the worker's compensation statute; (3) at the time of the injury, the employee is performing services growing out of or incidental to his or her employment; (4) the injury is not intentionally self-inflicted; and (5) the accident or disease causing injury arises out of employment. All parties agree that each of these conditions is met here. If, during the time the employee is disabled by injury, he or she sustains a wage loss, he or she is eligible for temporary disability benefits. WIS. STAT. § 102.43(1) and (2).

¶ 10. As discussed above, Race did not sustain a wage loss initially, since Emmpak continued to employ him on one-handed duty. Because he was receiving his wage, he was not entitled to disability payments. *See* WIS. STAT. § 102.43(6)(c). However, when he was terminated, Race did suffer a wage loss, which would ordinarily entitle him to TTD payments. *See* WIS. ADMIN. CODE § DWD 80.47 (Sept. 2005). The issue in this case is whether his entitlement to TTD is affected by the fact that his wage loss came after he was terminated for cause.

¶ 11. To answer this question, all parties point us to *Brakebush*, though they disagree on its import. In that case, the employee had injured his back on the job, and was temporarily unable to work. *Brakebush*, 210 Wis. 2d at 626. While he was absent from work, his employer conducted an investigation and discovered that he had been bow hunting and playing pool. *Id.* The

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

employer then discharged the employee for "misrepresentation of facts or giving false or misleading information regarding a work injury." *Id.* at 627. In the worker's compensation proceeding, the employer made two arguments: first, that the employee's recreational activities proved that he was not, in fact, disabled, and second, that even if he was disabled, he should not receive worker's compensation once he had been fired for cause. *Id.* at 630–31, 633. After upholding the Commission's finding of disability, the court also rejected the employer's second argument, quoting the Commission with approval:

> [W]hile the employer appears to have had sound reasons for terminating the applicant, this does not relieve the employer/insurance carrier from the obligation to pay temporary total disability benefits for the period in question . . . . To the employer and its insurance carrier, it may seem inequitable that the applicant is able to receive temporary disability benefits after having been discharged for good cause. However, worker's compensation is a statutory program and there is no provision in Chapter 102 which would allow the cutoff of temporary disability benefits as long as the work injury continues to cause disability.

*Id.* at 634.

¶ 12. The Commission therefore points to *Brakebush* to support its argument: while Emmpak may believe it is unfair to have to pay Race after he has been terminated for cause, the worker's compensation statute contains no provision excusing Emmpak from doing so. Emmpak, however, also relies on *Brakebush*, claiming that one factual difference between this case and *Brakebush* mandates a different result: the employee in *Brakebush* was out of work and receiving

compensation when he was terminated, while Race was on the job receiving his wages when he got fired. The difference is important, according to Emmpak, because in order to be compensable, a wage loss must be *caused by* the employee's injury. Emmpak quotes two passages from *Brakebush*: "[A]n injured employee who has been terminated is nonetheless entitled to disability benefits because the employee continues to be limited by the work-related injury. *It is the injury, not the termination, that is the cause of the employee's economic loss.*" *Id.* at 635 (emphasis added). "The purpose of worker's compensation disability benefits is to compensate employees who have lost the ability to work ... *due to* a work-related injury, regardless of whether they are good or bad employees." *Id.* at 636 (emphasis added). Emmpak argues that the employee in *Brakebush* did have such an injury-caused loss, since he left work immediately after his injury and began receiving disability. Here, however, Race had no wage loss following his injury; he continued at his old job (albeit on restriction) at the same rate of pay. According to Emmpak, it was therefore only his subsequent termination, unrelated to his injury, that caused him to lose his wage.

¶ 13. This argument has facial appeal. However, we must reject it because it takes an artificially narrow view of causation that goes against the purpose of the Worker's Compensation Act. The Act is a remedial statute that must be liberally construed to afford compensation. *Town of Russell Volunteer Fire Dep't v. LIRC*, 223 Wis. 2d 723, 734, 589 N.W.2d 445 (Ct. App. 1998). Though it is true that Emmpak's firing of Race was the immediate cause of his loss of his wage *from Emmpak,* it was not the only cause of his unemployment. When Race was injured, he was rendered unable

to use his left hand. As Race was an electrician, this injury obviously severely limited his ability to work; he testified at the hearing that his one-handed work at Emmpak involved "[r]unning for parts or whatever, things like that." At the time he was fired, Race was *still* unable to use his left hand, and thus was much less employable than he otherwise would have been. Though his termination was the reason *Emmpak* stopped paying him, the injury was still partially responsible for his economic loss, since he was severely restricted in his ability to find other work. Thus, just as the employee in *Brakebush*, Race "continue[d] to be limited by the work-related injury" and had "lost the ability to work . . . due to a work related injury."[2]

■

¶ 14. We further note that Emmpak's argument proves too much. Emmpak's argument is that Race's wage loss was caused not by his injury, but by his termination. Emmpak also argues that Race was termi-

---

[2] Emmpak also attempts to distinguish *Brakebush* on the grounds that the court there found that "Brakebush failed to submit adequate proof rebutting the extent of [the employee]'s injury." *Brakebush Bros., Inc. v. LIRC*, 210 Wis. 2d 623, 625, 563 N.W.2d 512 (1997). Emmpak argues that the *Brakebush* court would have decided differently if the employer had shown that the employee could have returned to work, as Race did here, because then it would have been the employee's termination, rather than his injury, that caused his wage loss. Emmpak's argument wrongly conflates the two issues in *Brakebush* into one. The just-mentioned quotation is the court's rejection of the employer's argument that the employee was not disabled at all and has nothing to do with the court's holding that an injured employee is not deprived of TTD by subsequent firing. The court did not state or imply that the rule would be different if the employer had provided the employee restricted-duty work before his termination.

nated for good reason; but how is this relevant to the first argument? The logical result would be the same if Race had been fired for a bad reason or for no reason at all, since it would still be the termination rather than the injury that deprived him of wages. Emmpak essentially argues that public policy favors drawing a distinction between the "good" termination for a safety violation and the "bad" termination for some other reason, but the Act does not make this distinction. The Act is the legislature's public policy decision, and we are not free to alter its scheme. *Town of Russell*, 223 Wis. 2d at 734.

¶ 15. In fact, the legislature has recently updated the Act to address situations similar to the one here. In March 2006, it passed 2005 Wis. Act 172, making several changes to the statutory scheme. The new provisions do not govern this case because the injury occurred while the old law was in effect. *See* Wis. Stat. § 102.03(4) (2005–06) (right to compensation to be determined by law on date of injury). Nevertheless, we find it instructive to consider how the legislature has responded to the Commission's and the courts' construction of the statutes. The new statute states that an employer is liable for temporary disability payments unless the employer provides suitable employment to the injured worker (this is the same rule the Commission has long applied as Wis. Admin. Code § DWD 80.47 (Sept. 2005)). The legislature has carved out three exceptions to this rule. The employer is *not* liable if it offers suitable work and the employee unreasonably refuses it, if the employee is charged with a crime and the termination is in connection with the alleged crime, or if the employee is terminated for violating an employer's drug policy that is written and regularly enforced. Wis. Stat. § 102.43(9) (2005–06). Notably

missing from the exceptions is a general "for-cause termination" or "safety-rule termination" policy like the one claimed by Emmpak here. Though, as we have stated, the new statute does not govern this case, we are loath to modify the old scheme in a way that does not comport with the new one.

*By the Court.*—Order affirmed.