SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL No. 150, Petitioner-Appellant-Cross-Respondent,

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent-Respondent-Cross-Appellant.†

Court of Appeals

*No. 2009AP1524. Oral argument May 12, 2010.*
*—Decided August 24, 2010.*

2010 WI App 126

(Also reported in 791 N.W.2d 662.)

† Petition for Review denied 12-7-10.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Service Employees International Union Local No. 150 ("SEIU") appeals from a circuit court order affirming a Wisconsin Employment Relations Commission ("WERC") decision that SEIU "acted in an arbitrary manner" when handling a grievance brought by terminated Milwaukee Public Schools ("MPS") employee Karen Bishop, and thereby breached its duty of fair representation. WERC cross-appeals from a subsequent circuit court order that modified the sanctions WERC imposed against SEIU for the breach of its duty of fair representation.

¶ 2. We reverse WERC's decision and the circuit court orders because we conclude that SEIU did not

452

breach its duty of fair representation. Because we reverse WERC's decision, including the imposition of sanctions, we do not consider the cross-appeal concerning the circuit court's modification of the sanctions.

## PROCEDURAL HISTORY

¶ 3. The dispositive issue on appeal was one of numerous issues addressed by WERC, all of which we briefly recount here for background purposes.

¶ 4. Bishop was employed at the Milwaukee School of Languages as a Handicapped Children's Assistant from 1990 until March 2004, when she was terminated. MPS stated the following reasons for termination: "(1) Pushing a child[1] [on February 13, 2004]; (2) Failing to comply with attendance procedures, and Absence Without Approved Leave on February 18, 19, 20, and 24, 2004; and (3) [Bishop's] overall record and history of absences."

¶ 5. Nearly two years later, on January 4, 2006, Bishop filed with WERC a prohibited practice complaint against both MPS (her employer) and SEIU (her union). The complaint alleged that MPS had violated its collective bargaining agreement when it terminated Bishop's employment. The complaint also alleged that SEIU had breached its duty of fair representation in the course of grieving Bishop's termination.[2]

---

[1] The record indicates that the student was twenty years old, but functions at a two-year-old level.

[2] Later in this opinion, we provide details concerning SEIU's handling of the grievance. Additional details can be found in the numerous WERC decisions available online at http://werc.wi.gov/decisions_pdf_archive_intro.htm. *See Bishop v. Milwaukee Pub. Sch.*, Decision Nos. 31602–B, 31602–C, 31602–E, 31602–F & 31602–G.

¶ 6. WERC bifurcated the claims against MPS and SEIU.[3] Bishop's claim against SEIU was heard first. On July 25, 2006, a WERC hearing examiner concluded that SEIU *had not* breached its duty of fair representation of Bishop. On January 2, 2007, WERC issued a decision reversing the hearing examiner, concluding that SEIU *had* breached its duty of fair representation, for reasons discussed in detail later in this opinion. WERC ordered SEIU to reimburse Bishop for the costs, including reasonable attorney fees, incurred in advancing her just-cause-discharge claim. SEIU was also ordered to notify all MPS employees of WERC's order by posting notices in each workplace.

¶ 7. Further, WERC held that because it had determined that SEIU breached its duty of fair representation, WERC would exercise its jurisdiction to hear the merits of Bishop's discharge grievance. WERC notified the parties that its orders concerning Bishop's claim against SEIU were not yet final for purposes of seeking judicial review in the circuit court, as her claim against MPS had yet to be heard.

¶ 8. A hearing examiner heard Bishop's case against MPS. The examiner weighed the credibility of numerous witnesses to the incident and found that "[w]hatever actually occurred" on the day Bishop allegedly pushed the student, "the preponderance of the evidence does not establish that [Bishop] engaged in the intentional and unprovoked assault that formed the basis of the discharge." The examiner concluded that MPS did not have just cause to terminate Bishop and

---

[3] WERC subsequently explained that the two claims were bifurcated because a finding that the union breached its duty of fair representation was a prerequisite to WERC asserting jurisdiction over Bishop's related breach-of-contract claim against MPS.

had therefore violated the collective bargaining agreement. *See* Wis. Stat. § 111.70(3)(a)5. (2007–08).[4] MPS was ordered to reinstate Bishop and "make her whole," which included paying her back pay.

¶ 9. Subsequently, MPS asked WERC to order that SEIU contribute to the payment of Bishop's back pay. WERC denied the request.

¶ 10. With the proceedings before WERC now completed, SEIU filed the petition for review in the circuit court that is the subject of this appeal; MPS did not seek review of the WERC decisions. SEIU asked the circuit court to set aside WERC's decision that it breached its duty of fair representation. In the alternative, SEIU asked the circuit court to modify WERC's order so that it had to post notice of the decision only at Bishop's school, not at every school where SEIU serves as the collective bargaining representative of MPS employees.

¶ 11. The circuit court affirmed WERC's decision, but it did not address SEIU's request to limit the notice required to a single school. Subsequently, the circuit court issued an order providing that SEIU was required to post the notice only at Bishop's school.

¶ 12. SEIU appeals from the affirmance of WERC's decision that it breached its duty of fair representation, while WERC cross-appeals the order limiting the notice that SEIU must provide.

## DISCUSSION

¶ 13. The dispositive issue on appeal is whether we should overturn WERC's conclusion that SEIU breached its duty of fair representation. We begin our

---

[4] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

analysis by considering the appropriate standard of review. Next, we review the applicable law concerning a union's duty of fair representation. Third, we detail WERC's findings and conclusions. Finally, we analyze those findings and conclusions, ultimately reversing WERC's decision that SEIU breached its duty of fair representation.

## I. Standard of review.

¶ 14. On appeal of an administrative agency decision, we review the decision of the agency, not the decision of the circuit court. *Bunker v. LIRC*, 2002 WI App 216, ¶ 13, 257 Wis. 2d 255, 650 N.W.2d 864. "An agency's findings of fact are conclusive on appeal if they are supported by credible and substantial evidence." *Milwaukee Bd. of Sch. Dirs. v. WERC*, 2008 WI App 125, ¶ 7, 313 Wis. 2d 525, 758 N.W.2d 814 (citing WIS. STAT. § 102.23(6)). "Credible evidence is that evidence which excludes speculation or conjecture," and "[e]vidence is substantial if a reasonable person relying on the evidence might make the same decision." *Id.*

¶ 15. "[D]epending on the circumstances, an agency's interpretation of a statute is entitled to one of the following three levels of deference: great weight deference, due weight deference or no deference." *County of Dane v. LIRC*, 2009 WI 9, ¶ 14, 315 Wis. 2d 293, 759 N.W.2d 571. "Under great weight deference, the agency's interpretation will be upheld if it is reasonable, even if there are other, more reasonable interpretations." *Id.*, ¶ 16. To accord great weight deference, four requirements must be met:

"(1) the agency was charged by the legislature with the duty of administering the statute; (2)[] the interpretation of the statute is one of long-standing; (3)[] the agency employed its expertise or specialized knowledge in forming the interpretation; and (4)[] the agency's interpretation will provide uniformity and consistency in the application of the statute."

*Id.* (citation omitted; brackets in County of Dane).

██ ██

¶ 16. "Under due weight deference, we will uphold the agency's reasonable interpretation of a statute as long as another interpretation is not more reasonable." *Id.*, ¶ 17. When no deference is given, we review the issue *de novo. Id.*, ¶ 18. Our supreme court has observed "that there is little difference between due weight deference and no deference, since both situations require 'us to construe the statute ourselves. In so doing, we employ judicial expertise in statutory construction, and we embrace a major responsibility of the judicial branch of government, deciding what statutes mean.'" *Id.*, ¶ 19 (citation omitted).

██

¶ 17. Here, we are called upon to consider WERC's legal conclusion that SEIU breached its duty of fair representation, which is a judicially created doctrine. *See Lewis v. Local Union No. 100 of the Laborers' Int'l Union of N. Am., AFL-CIO,* 750 F.2d 1368, 1375 (7th Cir. 1984); *see also Mahnke v. WERC,* 66 Wis. 2d 524, 534, 225 N.W.2d 617 (1975) (applying duty of fair representation to Wisconsin union). WERC argues that because "[t]he duty of fair representation is implicit" in the Municipal Employment Relations Act ("MERA"), *see* WIS. STAT. §§ 111.70–111.77, WERC's interpretation of MERA "is entitled to 'great weight' deference." WERC explains:

> Given that [WERC] is the agency charged by the legislature with the duty of administering MERA and the statute at question, [WERC's] interpretation of the duty of fair representation in the collective bargaining arena is of long-standing, the case at hand is factually intensive and intertwined with such interpretation, and the decision whether a union breaches its duty of fair representation is a question of fact, great weight deference is appropriate in reviewing [WERC's] decision.

(Citation omitted.) In the alternative, WERC urges us to apply "due weight" deference.

¶ 18. WERC's acknowledgement that the duty of fair representation is only *implicit* in the statute is acknowledgement that the duty of fair representation is a judicially created doctrine. We reject the great weight standard because the agency here is interpreting a purely judicial doctrine as to which the agency cannot claim greater expertise than the courts. *See Beecher v. LIRC*, 2004 WI 88, ¶ 26, 273 Wis. 2d 136, 682 N.W.2d 29 (*de novo* review applied where agency's decision interpreted Wisconsin Supreme Court decision concerning judicially created doctrine and did "not purport to interpret a statute or administrative rule"); *see also Emmpak Foods, Inc. v. LIRC*, 2007 WI App 164, ¶ 5, 303 Wis. 2d 771, 737 N.W.2d 60 (recognizing *Beecher*'s holding that *de novo* review is appropriate where an agency's conclusion is based on a judicially created doctrine). We do not consider it necessary to resolve which of the remaining standards of review apply because we come to the same conclusion applying due weight deference as we do with a *de novo* review.

## II. The duty of fair representation.

■ ■

¶ 19. Pursuant to most collective bargaining agreements, the union exercises authority over the grievance procedure, has the ability to settle a grievance over an employee's objection and decides whether to pursue arbitration of a grievance. *See Mahnke*, 66 Wis. 2d at 529–31. However, an employee has other remedies if a union wrongfully refuses to process a claim and thereby breaches its duty of fair representation. *See id.* at 531. The United States Supreme Court established the legal standards for the duty of fair representation in *Vaca v. Sipes*, 386 U.S. 171 (1967). The duty arises from a union's statutorily created, exclusive ability to negotiate collective bargaining agreements and to decide whether to arbitrate grievances regarding the meaning and application of such agreements. *See id.* at 177; *see also Labbe v. Hartford Pension Comm'n*, 682 A.2d 490, 502 (Conn. 1996) ("Th[e] duty of fair representation derives from the union's status as the sole bargaining representative for its members. As such, the union has the exclusive right and obligation to act for its members and to represent their interests.").

■■ ■

¶ 20. "[A] union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Vaca*, 386 U.S. at 192. "[N]ot even proof that a grievance was meritorious is sufficient by itself to prove breach of the duty of fair representation." *Tully v. Fred Olson Motor Serv. Co.*, 37 Wis. 2d 80, 91, 154 N.W.2d 289 (1967); *see also Vaca*, 386 U.S. at 192–93 ("[I]f a union's decision

that a particular grievance lacks sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced."). Rather, a breach of the duty of fair representation "occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. Our supreme court adopted the *Vaca* test for evaluating alleged breaches of a union's duty of fair representation in *Mahnke*, recognizing that " '[e]*ven if an employee claim has merit,* a union may properly reject it unless its action is arbitrary or taken in bad faith.' " *See id.*, 66 Wis. 2d at 531 (emphasis added and citation omitted).

¶ 21. At issue in this case is WERC's conclusion that SEIU breached its duty of fair representation through arbitrary conduct. Whether a union acted arbitrarily "requires inquiry into the objective adequacy of union action."[5] *Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers of Am.*, 30 F.3d 60, 63 (7th Cir. 1994). Our supreme court has recognized that "acts of omission not intended to harm a member [of the union] 'may be so egregious, so far

---

[5] Conversely, whether a union's conduct was discriminatory or in bad faith "requires inquiry into the subjective motivation behind union action." *See Trnka v. Local Union No. 688, United Auto., Aerospace Agric. Implement Workers of Am.*, 30 F.3d 60, 63 (7th Cir. 1994); *see also Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (explaining that "[w]hether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive").

short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.' " *Coleman v. Outboard Marine Corp.*, 92 Wis. 2d 565, 580, 285 N.W.2d 631 (1979) (quoting *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082, 1090 (9th Cir. 1978)). *Coleman* further cited *Robesky* for the following proposition:

> "[U]nintentional acts or omissions by union officials may be arbitrary if [1] they reflect reckless disregard for the rights of the individual employee[,] . . . [2] they severely prejudice the injured employee . . . and [3] the policies underlying the duty of fair representation [ability to screen meritless grievances and allocate union resources] would not be served by shielding the union from liability in the circumstances of the particular case."

*Coleman*, 92 Wis. 2d at 580 (quoting *Robesky*, 573 F.2d at 1090) (ellipses and final set of brackets in *Coleman*).

¶ 22. In its appellate brief, WERC correctly described union conduct that is *not* a breach of the arbitrary prong of the duty of fair representation:

> [I]t is well-established that a union does not breach its duty of fair representation simply by negligently processing a grievance, simply by failing to communicate with a grievant, simply by making unwise or improvident decisions about the merits of a grievance, or simply by settling a grievance against the wishes of the grievant.

WERC's statement is consistent with *Trnka*, which held:

> "[A] union only violates the arbitrary prong of the analysis when the union's actions are so far outside a wide range of reasonableness that the actions rise to the level of irrational or arbitrary conduct. Under this

extremely deferential standard, courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that [the] union could have made a better call."

*Id.*, 30 F.3d at 61 (citation omitted); *see also Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) ("[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.") (citation omitted).

██ ██

¶ 23. When considering a union's decision not to arbitrate, WERC may not substitute its judgment on the merits of a grievance for that of the union, even if it appears that the union could have made a better decision. *See Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 370 (7th Cir. 2003). Similarly, "[c]ourts 'should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.' " *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (citation omitted).

### III. Review of the relevant decisions of the hearing examiner and WERC.

¶ 24. The hearing examiner and WERC made numerous findings of fact, many of which were undisputed. The following factual findings were either made by the hearing examiner and affirmed by WERC, or made by WERC on its own. MPS and SEIU were parties to a collective bargaining agreement, pursuant to which an employee could grieve discipline using a four-step process. The first three steps involved meetings with

the employee's next highest authority, a department head and the superintendent, respectively (hereafter, Steps 1, 2 and 3). A decision made by the superintendent in Step 3 of the process was subject to arbitration before an impartial referee "upon certification to him/her by the Union," which would be Step 4.

¶ 25. The incident that gave rise to Bishop's termination occurred on February 13, 2004. Specifically, Bishop interacted with a cognitively disabled student who was upset at Bishop. According to one witness, Bishop pushed the student away after the student approached her.[6] Days later, Bishop contacted SEIU Representative Carol Vian to discuss the incident. Vian represented Bishop at a pre-disciplinary hearing at the end of February 2004. The school principal provided Vian with copies of the written statements of the witnesses. When the meeting concluded, the principal told Bishop to return to work and wait for a decision. Bishop was thereafter notified by letter that she was being discharged for pushing the student, failing to comply with attendance procedures and her overall history of absences.[7]

¶ 26. SEIU Representative Carmen Dickinson notified Bishop that she would grieve the termination and would meet with the Central Office. On March 18, 2004,

---

[6] There were conflicting witness accounts of the incident. We do not attempt to summarize the conflicting accounts, as the issue before us is SEIU's handling of the grievance, not resolution of the factual disputes concerning the pushing incident.

[7] Bishop's attendance issues were not discussed in WERC's decision or on appeal. According to the hearing examiner that heard Bishop's claim against MPS, "the alleged attendance violations could not support a discharge for an employee with [Bishop's] work record." Thus, the allegation that Bishop pushed a student was the key issue in her grievance.

463

Dickinson filed a written grievance on Bishop's behalf. Prior to Step 2 of the grievance procedure, Dickinson spoke with both Bishop and Vian about the grievance.

¶ 27. At the Step 2 grievance meeting, Dickinson and Bishop met with two MPS representatives. Shortly after the meeting started, Dickinson interrupted one of the MPS representatives, referenced SEIU's written statement of facts and complaint that she had provided and said that they would wait to hear from MPS. Bishop did not speak on her own behalf. Bishop's grievance was denied in writing. The decision noted:

> Evidence supports the allegations of misconduct and the level of discipline was appropriate. While Ms. Dickinson was unwilling to discuss the allegations, she provided a "Statement of Facts" as she saw them. However, many of the points Ms. Dickinson was attempting to make were inaccurate or irrelevant, and she chose to ignore certain other facts.
>
> The age of the student and her history of behavioral problems do not excuse Ms. Bishop for pushing the student.

The decision also discussed Bishop's attendance. In response, Dickinson faxed a letter to one of the reviewers complaining about the conduct of an MPS representative at the Step 2 hearing.

¶ 28. The grievance proceeded to Step 3. In July 2004, Dickinson and Bishop twice met with Cleo Rucker of the MPS labor relations office. Prior to those meetings, Dickinson provided Rucker with records of the unemployment compensation hearing at which the hearing examiner found that MPS's witnesses against Bishop were not credible. At the second meeting, Rucker said that because "he was relatively new on the job, the Step 3 decision probably would be made at a

higher level in the MPS organization." WERC later found that during these meetings, "[t]here was no explicit discussion about time limits for receiving the Step 3 response," and noted that "it was not uncommon for MPS officials to exceed the contractual time limits for responding to grievances, with the unwritten but express or tacit acquiescence of the Union." Indeed, Dickinson testified that she spoke with Rucker and orally gave him an unspecified extension of time to provide the written decision, hoping to achieve a settlement. Dickinson also testified that when she started representing employees at MPS, she inherited cases where grievances had been extended for longer than a year.

¶ 29. For months after the July 2004 meetings with Rucker, the grievance remained in Step 3 because MPS had not issued a written decision on the grievance. In November 2004, Dickinson obtained an oral offer from MPS to settle the Bishop grievance. The MPS offer would have returned Bishop to her job, placed her on eighteen months' probation, and "was firm that there would be no back pay." Dickinson communicated the offer to Bishop.

¶ 30. Bishop rejected the offer. Bishop later testified that she did so because the offer "wasn't acceptable" since she would not receive back pay. She also said that "probation would be a very shaky basis [on which] to go back [to work]" and that she wanted to see a list of openings so she could return to a different school.

¶ 31. In the first half of 2005, Bishop left telephone messages for Dickinson and other SEIU officials. In June 2005, SEIU representative Michael Thomas— who ultimately took over Bishop's grievance from Dickinson—called Bishop, indicated that he had re-

ceived her messages and said he was sorry that no one had returned her calls.[8] He said she would be hearing from someone.

¶ 32. In September 2005, Bishop wrote to the SEIU state president, with copies to Vian, Dickinson and Thomas. She expressed her frustration with the length of time the process was taking and asked for help "re-start[ing] a dialogue with MPS." She subsequently sent a similar letter to the president of Wisconsin SEIU.

¶ 33. On October 6, 2005, Dickinson received from MPS the Step 3 written decision denying Bishop's grievance. The decision was dated January 5, 2005. The hearing examiner made the following finding with respect to the fact that Dickinson did not receive the decision for ten months: "Normally, MPS would send a copy of this form to the Complainant. [Bishop] never received a copy of this form." While WERC affirmed this finding, it also made further findings with respect to Dickinson's receipt of the January 2005 decision:

> While Dickinson testified that she herself did not receive a copy of the response until October, when she called MPS and asked for it, it is not clear on this record whether Thomas or another Union official may have received the response at or about the time frame in which it was dated.
>
> . . . .
>
> Absent credible evidence to the contrary, it is reasonable to infer, and we do infer, that MPS sent that document to the Union in the regular course of business at or around the dates stated on the document.

---

[8] From 2001 to sometime in 2005, Carmen Dickinson was the primary SEIU representative for the MPS bargaining unit to which Bishop belonged. By October 2005, Michael Thomas replaced Dickinson as the SEIU bargaining unit representative.

While Dickinson herself may not have seen the response until October 2005, when she called and asked for a copy, Dickinson had relinquished responsibility for Bishop's grievance to Thomas and presumably Thomas, rather than Dickinson, would have been responsible for following up on the Step 3 denial. Second, even if the record established that the Union did not receive the Step 3 response until October 2005, the record supplies no reasonable explanation for the Union's failure to seek the long overdue response until that late date.

¶ 34. In October 2005, Dickinson and Thomas reviewed the January 2005 decision and discussed Bishop's grievance. Dickinson told Thomas that MPS had orally offered a last chance agreement and said she thought they should see if they could get that offer in writing and settle the grievance. Dickinson also recommended to Thomas that SEIU not arbitrate Bishop's grievance.[9]

¶ 35. In November 2005, Thomas called Bishop to set up a meeting with Rucker to discuss the latest MPS offer. The hearing examiner found:

> At that time, [Bishop] repeatedly questioned why she had not had a response to her letter of September 1, 2005 and Thomas did not answer this question. [Bishop] told Thomas that she was considering filing a complaint with the WERC and that he might hear from the WERC . . . . [Bishop] cancelled one scheduled meeting because she had a conflict and the meeting was rescheduled to November 29, 2005. By letter dated November 14, 2005, Thomas advised [Bishop] of the following:
>
> ["]Your grievance has been settled; Milwaukee Public lic Schools office of Labor Relations has offer[ed] you a

---

[9] WERC found that it was not necessary to determine the precise reasons why Dickinson recommended not pursuing arbitration.

Last Chance Agreement. Please make arrangements
with Labor Relations to sign the Agreement, and re-
turn to work[."]

Bishop met with Rucker and Thomas on November 29.
They discussed the terms of the Last Chance Agree-
ment, which included the following provisions:
(1) Bishop would "voluntarily and regularly participate
in approved anger management treatment"; (2) Bishop
would be subject to summary discharge for any inap-
propriate conduct; and (3) Bishop's absence from
March 2004 until her return to work would be re-
corded as a disciplinary suspension and she would
receive no back pay. Thomas, Rucker and Bishop
reviewed current openings at other schools. They also
discussed what Bishop would need to do to comply
with the anger management treatment and documen-
tation requirement, which MPS referred to as similar
to an Employee Assistance Program. A few days after
the meeting, Bishop contacted Thomas and told him
that she could not accept the agreement.

¶ 36. WERC later found that Bishop decided not
to accept the settlement

> because she did not wish to accept what she perceived as
> an implication that she had engaged in wrongdoing
> and/or needed "anger management" counseling, because
> she was concerned about the privacy of her communica-
> tions with her counselor, and because she believed she
> was entitled to some back pay for the one and one-half
> years that her grievance had been pending.

Thomas tried to get Bishop to reconsider so she could
retain her job. He was unsuccessful. Before Bishop
rejected the Last Chance offer, neither Thomas nor
Dickinson specifically told Bishop that SEIU had de-

cided not to arbitrate her grievance.[10] SEIU did not seek arbitration. Thereafter, Bishop filed her complaint against SEIU and MPS.

¶ 37. The hearing examiner found that Bishop had failed to prove that SEIU acted in an arbitrary, discriminatory or bad faith fashion and concluded that SEIU therefore had not breached its duty of fair representation. WERC reversed, finding that SEIU's "conduct in processing Ms. Bishop's discharge grievance between November 2004 and November 2005, taken as a whole, did not adequately protect Ms. Bishop's interests and resulted in a disposition that was arbitrary."[11]

---

[10] Dickinson testified that after receiving the Step 3 denial in October 2005, she reviewed the facts with Thomas and recommended not going to arbitration because she believed the grievance would not be sustained. WERC did not find when, in fact, the decision not to arbitrate was made.

[11] WERC's decision states in several places that its finding of arbitrariness is the basis for its decision that SEIU breached its duty of fair representation. WERC did not specifically find bad faith or discriminatory action, and at oral argument WERC explicitly recognized that its decision was based on a finding of arbitrary conduct, rather than bad faith. This is significant, because discriminatory action, bad faith and arbitrary conduct form "three separate and distinct possible routes by which a union may be found to have breached its duty." *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994). Nonetheless, WERC's lengthy decision includes statements that SEIU: lacked a "good faith decision," "crossed the line from negligence to intentional disregard" and engaged in action that "cannot be reconciled with [SEIU's] duty to conduct itself with 'complete good faith and honesty of purpose.'" (Quoting *Humphrey v. Moore*, 375 U.S. 335, 349 (1964).) We do not attempt to reconcile WERC's use of these terms with its decision to rely on its finding that SEIU's conduct was arbitrary, as opposed to bad faith, or to address every characterization of SEIU's actions. We also do not address WERC's position at oral argument that its

WERC concluded that this arbitrary handling of Bishop's grievance constituted a breach of SEIU's duty of fair representation.

¶ 38. WERC's finding that SEIU's conduct had been arbitrary centered on SEIU's conduct between November 2004 and November 2005. Specifically, WERC stated that it was "not particularly troubled by [SEIU's] initial efforts" with respect to the grievance, but concluded that the union's efforts were inadequate beginning in November 2004. WERC explained:

> [T]he Union obtained a settlement proposal from MPS in November 2004 that, though not to Bishop's liking, might have passed muster as a good faith alternative to arbitration *at that time* . . . .
>
> . . . .
>
> The Union's handling of the November 2004 settlement proposal is where its conduct begins to deviate from a minimally adequate handling of Ms. Bishop's grievance.

¶ 39. WERC acknowledged that not one of the "specific defects" in SEIU's handling of the grievance "in itself would necessarily exceed the wide deference a union appropriately has." Nonetheless, WERC found— for the first time in its history—that those same defects, considered as a group, could constitute arbitrary conduct.

¶ 40. WERC identified the following deficiencies in SEIU's handling of the grievance. WERC faulted Dick-

---

references to a "lack of good faith" were not references to "bad faith." Resolution of those issues is not required in this case. For reasons discussed in this decision, we reject WERC's conclusion that various substantially different actions, in combination, constituted arbitrary conduct and, therefore, a breach of SEIU's duty of fair representation.

inson for not sharing her doubts about Bishop's grievance at the time Dickinson communicated with Bishop about the November 2004 settlement offer. WERC explained:

> [Dickinson] said nothing to Bishop to suggest that her grievance lacked merit, that other witnesses would have more credibility than she would, or that the Union might for any other reason choose not to arbitrate if Bishop declined the settlement. Indeed, after Ms. Bishop rejected the proposed settlement, she inquired about the next step to arbitration and Dickinson informed her that the Union would need a response from MPS before it could proceed. While there is no reason to conclude that Dickinson was intentionally misleading Bishop with this response, the response certainly gave Bishop no inkling that the Union had reservations about the grievance.

¶ 41. WERC also faulted SEIU for "knowingly let[ting] Bishop's discharge grievance languish for nearly a year with no action whatsoever, despite Bishop's repeated attempts to move it forward." WERC noted that SEIU failed to return Bishop's calls in early 2005. It also found that SEIU must have received the Step 3 decision from MPS in January 2005, despite SEIU's assertion that it had not received the decision until October 2005, and said that SEIU should have shared that decision with Bishop. WERC concluded that even if SEIU had not received the decision in January 2005, it should have sought MPS's "long overdue response" prior to October 2005.

¶ 42. WERC also criticized SEIU's decision-making process because its process "did not include a discussion about the facts or other merits of the case with Bishop herself, let alone any of the other witnesses." Nonetheless, WERC also emphasized that its "conclusion in this case does not rest upon the wisdom or lack of

471

wisdom in [SEIU's] decision not to arbitrate." WERC determined that between November 2004 and November 2005, SEIU "acted in an arbitrary manner in handling Ms. Bishop's grievance."

### IV. Analysis of WERC's decision.

¶ 43. We do not disturb WERC's findings (including those adopting the hearing examiner's findings) concerning what occurred in the grievance process, with one exception: we overturn WERC's finding that SEIU received the Step 3 decision when it was issued in January 2005. We also reverse WERC's ultimate finding that SEIU's conduct was arbitrary. Therefore, we also reverse WERC's conclusion that SEIU breached its duty of fair representation through arbitrary conduct.

¶ 44. With respect to the date SEIU received the Step 3 decision, WERC, in the discussion section of its decision, found as follows:

> The record includes a Step 3 response from MPS dated January 5, 2005. *Absent credible evidence to the contrary, it is reasonable to infer, and we do infer, that MPS sent that document to the* Union in the regular course of business at or around the dates stated on the document. While Dickinson herself may not have seen the response until October 2005, when she called and asked for a copy, Dickinson had relinquished responsibility for Bishop's grievance to Thomas and presumably Thomas, rather than Dickinson, would have been responsible for following up on the Step 3 denial.

(Emphasis added.) WERC's finding that SEIU received the decision in January 2005 is contrary to Dickinson's testimony that she did not receive it until she contacted MPS in October 2005 to check on the status of the

decision. Indeed, Bishop similarly testified that she did not receive the Step 3 decision. There was no testimony from MPS indicating that the decision had definitely been mailed to either SEIU or Bishop.

¶ 45. The only facts in the record are that both Bishop and Dickinson received the Step 2 denial from MPS, but neither received the Step 3 denial. Consequently, WERC's inference that some unidentified person at SEIU received the Step 3 denial in January 2005 and did nothing, is not supported by *any* evidence, much less by "credible and substantial evidence." *See Milwaukee Bd. of Sch. Dirs.*, 313 Wis. 2d 525, ¶ 7; Wis. Stat. § 102.23(6). As such, that inference cannot be used to support WERC's finding that SEIU acted arbitrarily when it did not share the January 2005 decision with Bishop prior to October 2005.

¶ 46. Next, we agree with WERC that none of SEIU's deficiencies between November 2004 and November 2005 (the time period upon which WERC explicitly based its decision), *in and of themselves,* constituted arbitrary conduct. At oral argument, WERC agreed that the following list adequately summarized the deficiencies on which it based its decision: (1) SEIU failed to respond to Bishop's calls in early 2005; (2) SEIU should have pushed MPS for a decision and not given MPS oral extensions to delay the Step 3 decision so long; (3) SEIU should have explained to Bishop why it was not pursuing the grievance after she rejected, for the second time, MPS's offer; and (4) Dickinson should have explained her "about face" in concluding that the witnesses against Bishop would have been believed over Bishop, after Dickinson said that the testimony from the unemployment compensation hearing would benefit Bishop's case. In addition,

WERC emphasized in its brief that SEIU's failure to interview the witnesses was also a factor. None of these alleged deficiencies constitute arbitrary action.

¶ 47. Many of the deficiencies relate to communication. But poor communication in and of itself does not constitute arbitrary conduct. *See Tracy v. Local 255 of the Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 783 F. Supp. 1527, 1531 (D. Mass. 1992) ("[F]ailure of the Union to provide information on the *status* of a grievance is not indicative of arbitrary behavior in the processing of the grievance itself . . . . Lack of communication, without more, is insufficient to evidence arbitrary or capricious processing of a claim."); *see also Air Line Pilots Ass'n*, 499 U.S. at 67 ("union's actions are arbitrary only if . . . so far outside a 'wide range of reasonableness' as to be irrational") (citation omitted).

¶ 48. Moreover, each of these alleged deficiencies fails to constitute arbitrary conduct because Bishop has not shown how she was prejudiced. *See Coleman*, 92 Wis. 2d at 580 (union actions " 'may be arbitrary if they . . . *severely prejudice* the . . . employee' ") (citation omitted; emphasis added). While more frequent and detailed communication would certainly have been appreciated, Bishop has failed to show how she was prejudiced by SEIU's infrequent communication, or by SEIU's failure to seek a faster decision from MPS. She has not offered any evidence that MPS's offer would have been different had SEIU pushed MPS for the Step 3 decision sooner.

¶ 49. Furthermore, Bishop has never asserted that she would have accepted MPS's first or second offer (both of which excluded back pay, which she made clear was a deal breaker) had she been better informed about

SEIU's opinion of her case or Dickinson's opinion that the witnesses against Bishop may be viewed as credible. For that reason, Bishop's case is different from that of the claimant in *Robesky*, a case that our supreme court quoted in *Coleman, see id.*, 92 Wis. 2d at 580–81, and a case which WERC argues supports Bishop's claim.

¶ 50. *Robesky* involved an employee who was discharged for poor attendance caused by frequent migraine headaches—completely different conduct than is present here. *See id.*, 573 F.2d at 1084. Robesky's union representative was in Hawaii, where she was based. *Id.* at 1086. After rejection of the grievance at the third and final step, the Hawaii union official sent a proposed submission for arbitration of Robesky's grievance to his superiors in California. *Id.* The California union officials failed to file the submission within the time set by the contract and so, "[e]ither because of this tardy submission or, as the Union contends, because of their low evaluation of the merits of [Robskey's] grievance, [they] decided to settle the grievance short of arbitration." *Id.*

¶ 51. The trial court, considering Robesky's claim against the union, found that because there was no bad faith on the part of the union, the union had not breached its duty of fair representation. *Id.* On appeal, the court concluded that under the facts, the union may have breached its duty of fair representation through arbitrary conduct. *Id.* at 1086–88. The appellate court recognized that even if the union *unintentionally* withheld from Robesky the fact that her grievance would not be arbitrated, its conduct could be arbitrary if Robesky was "severely prejudice[d]." *Id.* at 1089–90. The key factual issue on remand, the appellate court held, would be whether the factfinder believed Robesky's testimony "that she would have accepted the

company's offer of reemployment had she known it was her only opportunity for reinstatement." *Id.* at 1087.

¶ 52. Unlike Robesky, Bishop never claimed that had she known about Dickinson's doubts about the merits of her grievance, she would have accepted one of the settlement offers.[12] Bishop's failure to ever allege and testify that if she had known there would be no arbitration, she would have accepted MPS's offer, distinguishes this case from *Robesky* and makes it more like *Saunders v. Youthcraft Coats & Suits, Inc.*, 700 F.2d 1226 (8th Cir. 1983), which held that the union had not breached its duty of fair representation where "the record supports the conclusion that it was [the employee's] desire for back pay and not the [u]nion's failure to advise her on the merits of her grievance that led [her] to reject [her employer's] offer." *See id.* at 1231. Without an allegation that Bishop suffered prejudice, we cannot conclude that SEIU's conduct was arbitrary and, therefore, a breach of its duty of good faith. *See Coleman*, 92 Wis. 2d at 580; *see also Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3rd Cir. 1970) (union's failure to inform member of its decision not to go forward is insufficient to establish unfair representation absent showing of prejudice.).

---

[12] Here, Bishop essentially demanded unconditional reinstatement and back pay. Bishop made clear both in November 2004 and November 2005 that she would not accept any agreement without back pay, or any agreement containing reinstatement conditions she deemed unacceptable. MPS made clear to Dickinson in November 2004 that it was not going to allow back pay, and Dickinson communicated that position to Bishop. The uncontradicted facts in the record support the inference that Bishop's unmet demands are what motivated her rejection of the offers to settle, not SEIU's failure to tell her it thought her case was weak or that it would not proceed to arbitration.

¶ 53. Finally, WERC in its decision opined that Dickinson should have interviewed the witnesses. Even if we assume that it would have been advisable to personally interview witnesses,[13] and that SEIU exercised poor judgment by not interviewing the witnesses between November 2004 and November 2005, that might be negligence, but such conduct would not establish a breach of the duty of fair representation. *See Cannon v. Consol. Freightways Corp.*, 524 F.2d 290, 294 (7th Cir. 1975) (" 'proof that the union may have acted negligently or exercised poor judgment *is not enough to support a claim of unfair representation*' ") (emphasis added and citation omitted). WERC's analysis also fails because there is no evidence that Bishop was prejudiced by the lack of interviews. WERC does not say what SEIU would have learned from conducting personal interviews that was not apparent in the written statements. Thus, there is no evidence that Bishop was harmed in any way, legally or factually, by the lack of personal interviews. *See Emmanuel v. International Bhd. of Teamsters, Local Union No. 25*, 426 F.3d 416, 420–21 (1st Cir. 2005) (union's conduct not arbitrary where employee who faulted union for not interviewing potential witnesses failed to "demonstrate[], as he must, that any of these employees would have provided beneficial information").

---

[13] WERC cites neither court decisions nor its own opinions which hold that the duty of fair representation requires a union representative to interview witnesses to events underlying a grievance rather than relying on written statements, prepared by the witnesses, at or about the time of the events. Our research has located no such authority.

¶ 54. Despite WERC's finding that none of the alleged deficiencies in and of themselves constituted arbitrary conduct, WERC found that "[t]aken as a whole," they constituted "a grievance procedure in default," and, therefore, SEIU had engaged in arbitrary conduct. WERC reiterated this position at oral argument, stating:

> [T]his is a decision that the grievance process in its totality was deficient, and specifically finding that it was arbitrary. [WERC] accepts the fact that . . . no specific act of the Union within this timeframe [11/04–11/05] in the processing of the grievance breached the duty, but all the factors taken together make it a deficient and arbitrary processing of the grievance.

We are not convinced.

¶ 55. WERC has never before held that various substantially different actions, none of which are arbitrary individually, can nonetheless become arbitrary in the aggregate and thereby support a determination that the union breached its duty of fair representation. WERC's decision does not explain the reason for its departure from existing policy. We conclude that WERC's analysis is contrary to existing case law outlining the actions that constitute arbitrary conduct. Moreover, WERC's analysis is problematic, because it makes it impossible for unions attempting to govern their conduct to know what conduct WERC will consider arbitrary. WERC's decision tells unions that certain acts are not arbitrary, but if a union engages in enough such acts, the union then breaches its duty of fair representation. This is hardly clear guidance, and it is contrary to the principles underlying the judicially created duty of fair representation.

¶ 56. For these reasons, we reject WERC's finding that SEIU's conduct was arbitrary under the totality of the circumstances, as well as its corresponding conclusion that SEIU breached its duty of fair representation. We reverse both the circuit court's orders and WERC's decision.

*By the Court.*—Orders reversed.